UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MARSHA BENEDEK, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FRANCISCAN ALLIANCE, INC., )<br>a/k/a FRANCISCAN HEALTH DYER, )<br>)<br>Defendant. ) | CAUSE NO. 2:20-CV-11-PPS |

# **OPINION AND ORDER**

Seventy three-year old Plaintiff, Marsha Benedek, is a registered nurse with a spotless employment record. She was fired by Franciscan Alliance after she peeked at medical records of a person who Franciscan says was a "person of notoriety." This designation is important because this type of violation calls for an automatic termination under Franciscan's employment policies. Franciscan is seeking summary judgment, but Benedek says there are questions of fact in her claim for age discrimination that preclude summary judgment given Franciscan's uneven enforcement of the policy. I agree with Benedek. In viewing the evidence in the light most favorable to Benedek, there are questions of fact for a jury to resolve over whether Benedek was meeting her employer's legitimate expectations and whether Franciscan's supposed reason for terminating Benedek is really just a pretext for firing her and replacing her with someone younger.

**Undisputed Facts**

Franciscan is a health care system that has facilities in Indiana and Illinois. Benedek worked as a charge nurse in the adolescent behavioral health unit at Franciscan's Dyer hospital for almost 30 years (from 1991-2019). [First Benedek Dep., DE 27-2, at 6.][1] As a registered nurse, Benedek had access to, and was trained to use, Franciscan's electronic medical records system, called "Epic." [*Id.* at 16-17.] Franciscan performed routine audits of Epic to make sure its strict privacy and security policies were being followed, and Benedek was aware that anything she did on the computer regarding accessing Epic could be viewed by Franciscan. [*Id.* at 12-16.] Additionally, Benedek had access to, and was familiar with Franciscan's HIPAA Privacy and Security Policy. [DE 27-1 at 9; DE 27-2 at 13-14.]

The written policy provides that Franciscan's employees were only permitted to "access, use, view, or disseminate information necessary to do their jobs. All other access will be considered a violation of this policy and subject to the appropriate Corrective Actions." [DE 27-1 at 36-37.] Although Benedek claims she was not aware of different levels of privacy violations [DE 27-2 at 36], the written Policy states that a Level 1 violation occurs in the case of unintentional access to protected health information and results in written counseling; a Level 2 violation occurs where there is an intentional violation or reckless disregard of the Policy which results in a HIPAA

---

[1] There are a number of exhibits attached in support of the memoranda. For uniformity, citations are to the blue cm/ecf document number and page number found at the top of each page.

violation, and that results in a three-day suspension without pay for the first offense, a five-day suspension without pay for the second offense, and termination of employment for the third offense; and a Level 3 violation is defined as "[u]nauthorized and intentional access to PHI [protected health information] of a person of notoriety" and "unauthorized and intentional access of PHI of multiple records without a business need" and a "Level 3 violation shall [result] in immediate termination of employment." [DE 27-1 at 46-47.]  The Franciscan privacy policy covers 54 pages; dozens of terms are defined in Section VI of the policy. [DE 27-1 at 49-62.]  The most critical term for our purposes is the term "person of notoriety."  Yet that term is left undefined in the Franciscan policy. *Id.*

   Franciscan claims that Benedek's actions rose to a Level 3 violation because she intentionally accessed the chart of a "person of notoriety" without a business need, and during that endeavor, she accessed a second patient's private information because they happened to have the same name.  Franciscan supports this theory as follows: on June 24, 2019, the Northwest Indiana Times published an article about a mother (B.C.), who was charged with felony neglect of her six-month old daughter, which resulted in the child's death. [Ex. A-3, DE 27-1 at 63.]  Benedek testified during her deposition that there was a photograph in the paper, and the mother looked very familiar to her. [DE 27-2 at 27.] Benedek said she felt really bad because sometimes they read sad things about their prior patients in the newspaper, and she wondered if this woman had been a previous patient of hers. [*Id.* at 27-28.]  She therefore used the Epic System to go into

3

the Patient Station and search B.C.'s name. *Id.* The system populated a list of two patients with the same name, with their ages next to their names. [*Id.* at 29-30.] Benedek knew one person was too old to have a young child, so "she opened up the one [she] thought was our patient, saw that it wasn't (her) patient . . . and [she] closed it up." [*Id.* at 29.] Benedek claims she did not see any of B.C.'s personal information (like her social security number, address, or date of birth.) [*Id.* at 31.] According to Benedek, she did not open B.C.'s online chart — she saw that B.C. was never a patient in her ward, and she closed it up. [*Id.* at 29-30.] It is undisputed that, no matter what information Benedek actually saw, she only accessed the online chart for a few seconds. [Benedek Continued Dep., DE 27-5 at 71-72; DE 27-2 at 27; DE 30-1 at 1.]

Franciscan initiated an audit on what they believed was a "newsworthy event," and Benedek was identified as an employee that accessed B.C.'s chart without a business need. [DE 27-4 at 20, 25; DE 27-1 at 2.] Linda Fletcher, the Administrative Director of Privacy at Franciscan Alliance, was involved in the internal investigation of Benedek's access to the patient records. [DE 27-1 at 1.] According to Fletcher, who reviewed the audit trails, Benedek clicked on both of the B.C. names listed, and after clicking on each of the B.C. names, the following protected and confidential information would have been visible to Benedek: the patient's social security number, address, date of birth, religious preference, race, gender, phone number, and physicians. [*Id.* at 3.] Fletcher believes the audit trail also reveals that when Benedick clicked on one B.C. name (the person in the newspaper), she clicked further into the patient's information,

4

revealing the patient's treatment encounters with the Franciscan system. [*Id.*] Fletcher believes that in accessing the chart of B.C. (the one from the article), Benedek was accessing the chart of a person of notoriety without a business need, and in pursuit of that information, Benedek also accessed a second patient named B.C.'s chart without a business need, and that each of these instances is a Level 3 violation per the HIPAA Privacy Policy. [*Id.*]

After the infraction was caught during the audit, Benedek was interviewed on June 28, 2019. [DE 27-2 at 49-50.] Following the interview, she was suspended for three days. *Id.* Franciscan determined that Benedek's actions constituted a Level 3 violation of the Private Policy, which it determined, required immediate termination. [DE 27-1 at 4.] Benedek was fired just a few days later, on July 2, 2019. [DE 27-2 at 50.]

Before this incident, Benedek did not receive a single disciplinary action prior to the one which resulted in her termination. [DE 27-5 at 67.] She received regular pay raises during her time with Franciscan, and every evaluation she received contained all top ratings. [DE 27-2 at 72; DE 30-1.] At the time of her termination, Benedek was almost 73 years old, and she was at the top of the Franciscan pay scale. [DE 27-2 at 51.]

Benedek received training by Franciscan as part of her employment. According to Benedek, she was trained that merely opening the Patient Station was not a HIPAA violation — it would only be a violation if she opened the Patient Encounters. [DE 27-5 at 67-68, DE 30-1 at 2.] Additionally, she did not recall ever being provided any training on what constitutes a "patient of notoriety." [DE 30-1 at 1.]

5

Benedek stated in her deposition that during her 29-year stint working with Franciscan she was the only one she was aware of that got fired for accessing the Patient Station without a business need. [DE 27-5 at 69-70; *see also* DE 30-1 at 1-2.] She also testified that she frequently personally observed other younger employees who accessed Patient Station, but did not receive any discipline at all. [*Id.* at 70.] And that at least three other employees accessed all of the patient encounters (and could see the privacy data), but were not terminated. *Id.* An employee by the name of Jennifer Otero told Benedek that she actually went into a patient's chart (which Benedek claims she did not do), but Otero was not terminated; she was only suspended. [DE 27-2 at 34, DE 27-5 at 45-46.] Benedek said Otero was younger, probably in her late forties. [DE 27-2 at 34; DE 27-5 at 64.] Additionally, a woman by the name of Beth Morrison who worked in the emergency consultation service, came to Benedek and told her she had gone into her daughter's chart, but Morrison had only been suspended. [DE 27-2 at 34.] She was younger than Morrison also. *Id.* Finally, someone told Benedek that there was a third staff member on the adult unit who went into a patient's chart, but just got suspended. [DE 27-2 at 35.] Benedek didn't hear that firsthand, though, and does not know that person's name. *Id.*

During her deposition, Linda Fletcher was asked the following questions and answered as follows:

> Q. Are there circumstances in which employees of Franciscan not only accessed Patient Station, but also accessed Patient Encounters, but were still only suspended and not terminated?

6

A. It's possible. Depending on the facts of the circumstances.

Q. Do you remember circumstances that led to suspension instead of termination?

A. Yes.

Q. Okay. How many people?

A. I don't know how many people.

Q. More than one time?

A. Yes.

Q. Within the past year of Marsha [Benedek] being fired?

A. Yes.

\* \* \* \*

Q. But you have agreed that there are employees who have access without a business need, information from Patient Station and Patient Encounters, that were not terminated, correct?

A. Based on the facts of their cases. Correct.

\* \* \* \*

Q. But did that happen more than ten (10) times?

A. Yes.

Q. More than ten (10) times where the employee was not terminated?

A. Yes.

Q. More than twenty (20) times?

A. Possibly. Yes.

Q. More than 50 times?

7

A.      I have – without reports, I have no way of knowing that for sure.

[DE 27-3 at 52-53, 60-61.] According to Benedek, who was present at Fletcher's deposition, it is true that at least 20 employees who committed comparable, or more serious, privacy violations than she was accused of committing, received less or no discipline, including some who were under the age of 40. [DE 30-1 at 2.]

Additionally, Franciscan posted a part-time job opening after Benedek was let go, and thereafter hired someone in her 40's, much younger than Benedek. [DE 27-2 at 51-53, 63.] Benedek talked to several Franciscan employees about the posting, and Benedek said "they were sickened. They thought it was horrible." [DE 27-2 at 53.] According to Benedek, other employees expected she was going to be "shoved out of Franciscan somehow" because it had happened before. [*Id.* at 54.]

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I must take the facts in the light most favorable to the party opposing the motion. *Fulk v. United Transp. Union*, 160 F.3d 405, 407 (7th Cir. 1998).

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his [or her]

8

compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). It used to be that the ADEA only protected employees between the ages of 40 and 70. But the upward age limit was later removed in 1986, and the statute now protects "individuals who are at least 40 years of age." 29 U.S.C. § 631(a); Pub.L. 95-256, § 3(a), 92 Stat. 189, Pub. L. 99-592, § 2(c)(1), 100 Stat. 3342.

The parties have both structured their arguments around the now commonplace *McDonnell Douglas* burden-shifting framework, which applies to ADEA cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *see Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018). Under this rubric, "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). "If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason" for the action. *Skiba*, 884 F.3d at 719 (quotation omitted). And if defendant does so, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* at 719-20.

But there is another way to analyze employment discrimination cases in the Seventh Circuit. And that alternative approach was announced in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The approach taken in *Ortiz* is more

9

holistic and simply asks whether, taking all of the employee's direct, indirect and circumstantial evidence into account, a "reasonable factfinder (could) conclude that the plaintiff's . . . (age) caused the discharge or other adverse employment action." *Id*. at 765.

The Seventh Circuit has acknowledged that the *McDonnell Douglas* framework "is not particularly helpful in organizing the evidence where the main issue is the plaintiff's job performance." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021). Instead, if the issue of job performance is at the heart of the dispute, and must be analyzed in detail at multiple stages of the *McDonnell Douglas* test, it is often "simpler to run through that analysis only once." *Id.* at 573-74 (quoting *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002)).

This is the case here where the core of the dispute is whether Benedek's actions constituted poor performance resulting in her termination. These questions apply towards her prima facie case, the alleged nondiscriminatory reason for her termination, and whether that reason was pretextual. Therefore, I'll only run through the analysis once, with an eye towards determining whether the evidence as a whole would permit a reasonable factfinder to conclude that Benedek's age, rather than job performance, is what led to her being sacked. *Khungar*, 985 F.3d at 574; *Ortiz*, 834 F.3d at 765. And for the reasons set forth below, I do think the evidence is sufficient for a reasonable fact finder to determine that Benedek was fired on account of her age. This is due largely in part to the number of material disputed facts.

Franciscan concedes that to qualify as a legitimate job expectation, the expectation itself must be objectively reasonable and communicated with the employee. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986).  Here, Benedek testified that she believed only going into Patient Station was *not* a violation of HIPAA or the Franciscan policies, and that she received training consistent with that understanding. [DE 27-5 at 68; *see also* DE 30-1 at 2.]  Franciscan disputes this fact – Fletcher, Franciscan's Administrative Director of Privacy, testified that there was no distinction between accessing patient demographic information and encounter details information – in her opinion, accessing *any* patient information without a business need was considered a breach. [DE 27-3 at 55-58.]  Additionally, Benedek didn't recall ever seeing or being provided anything regarding patients of notoriety in her training. [DE 30-1.] This is certainly plausible since the policy itself doesn't define the term.  So an employee is left adrift on what exactly that term might mean.  For her part, Fletcher simply concluded that because Benedek accessed the chart of a person of notoriety, her violations rose to an infraction level which required termination. [DE 27-1 at 4.]  But Fletcher's conclusion on who constitutes a person of notoriety begs the question.

Aside from what was expected from Franciscan (which is disputed), there is also a disagreement about how much information Benedek *actually* viewed.  According to Benedek, she did not see any of B.C.'s personal information (like her social security number, address, or date of birth), she only saw that B.C. was not a patient on her ward, and then she quickly closed out.  [DE 27-2 at 31.]  However, Fletcher stated in her

11

affidavit that after clicking on each of the B.C. names, Benedek would have seen the patient's social security number, address, date of birth, religious reference, race, gender, phone number, and physicians. [DE 27-1 at 3.] Mind you, I looked at the printed "audit trail" [DE 27-1 at 66-68] and it isn't obvious from that printout exactly what information Benedek saw, as it indicates things like "Patient Station accessed" and "masked data displayed" over the course of less than 30 seconds.

Basically, both parties have put admissible evidence in front of me on this matter of legitimate expectations, through the testimony of various individuals, and I cannot be the one to determine credibility - that is best left for the finder of fact. *See, e.g., Eggleston v. South Bend Cmty. Sch. Corp.*, 858 F.Supp. 841, 852 (N.D. Ind. 1994) (denying summary judgement on ADEA claim where several issues required credibility determinations).

In turning to whether Benedek has shown that Franciscan's reason was pretext for discrimination, case law says that pretext "means a dishonest explanation, a lie rather than an oddity or error." *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (citation omitted). But pretext has also been referred to as an employer's efforts to cover their tracks or hide the real reason for the action taken. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). A plaintiff can avoid summary judgment in a discrimination case if the plaintiff can produce evidence that the defendant's proffered reasons "are factually baseless, did not actually motivate the defendants, or were insufficient to motivate the adverse employment action." *O'Neal v. City of New Albany*,

293 F.3d 998, 1005 (7th Cir. 2002). "Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *Id.* Importantly, "once the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury - not the Court." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 724 (7th Cir. 2005) (citation omitted).

 In this case, Benedek has cast doubt on the reason for her termination. She has accomplished this by putting forth evidence that the discipline, or punishment, for improperly accessing a patient's online chart, has not been equally doled out among all employees. Franciscan argues that Benedek has not established that the other employees who accessed patients' online information and were not terminated are directly comparable, and she only has vague information about these other cases. [DE 27 at 17-19.] While I agree that this issue is somewhat close, I do think Benedek has established for the purposes of surviving summary judgment, a class of similarly situated individuals treated differently because of their age. Benedek herself has set forth three examples: Jennifer Otero told Benedek she went into a patient's chart, but Otero was just suspended. [DE 27-2 at 34, DE 27-5 at 45-46.] Benedek said Otero was younger, probably in her late forties. [DE 27-2 at 34; DE 27-5 at 64.] Additionally, Beth Morrison told Benedek she had gone into her daughter's chart, but Morrison was only suspended. [DE 27-2 at 35.] Morrison was also younger than Benedek. *Id.* Finally,

13

someone told Benedek that there was a third staff member on the adult unit who went into a patient's chart, but just got suspended. [DE 27-2 at 35.] "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).

Although Franciscan challenges all of these employee examples as being speculative hearsay, the hearsay objection is easily dealt with. On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (same). Here, the statements by other Franciscan employees might not be considered hearsay because they are statements by a party opponent. Fed. R. Evid. 801(d)(2). Or, Benedek could call Otero and Morrison to testify at trial and they can voice their accounts that way. And of course Franciscan is free to cross examine the other employees to try to uncover any differences between their circumstances and what happened to Benedek. But the situations are similar enough, I believe, to withstand summary judgment. *See Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) (noting "the critical question

14

is whether [the employees] have engaged in conduct of comparable seriousness.").

In addition to Benedek's evidence, Fletcher's own testimony that more than 20 employees accessed online accounts but were only suspended (instead of terminated), also calls into question the veracity of the reason given for terminating Benedek. [DE 27-3 at 52-53, 60-61.] It is true, as I have alluded to, that accessing the patient records of a "person of notoriety" is a different category of violation. But I think reasonable people could disagree over whether someone who has a newspaper article written about them suddenly makes them a person of notoriety as that term is used in Franciscan's policy.

In sum, the evidence is uncontradicted that Benedek was a 72-year old exemplary employee at the top of the pay-grade scale, who had received great reviews for almost 30 years. When I put the evidence in "a single pile" and evaluate "as a whole," I can say that a reasonable jury could find that Benedek's age led to her termination. *Ortiz*, 834 F.3d at 766.

## Conclusion

For the aforementioned reasons, Franciscan Alliance Inc.'s Motion for Summary Judgment [DE 26] is DENIED.

ENTERED: May 11, 2022.

 s/   Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT